1  KELLY A. JOHNSON
   Acting Assistant Attorney General
2  Environment and Natural Resources Division
   United States Department of Justice
3  Washington, D.C.  20530

4  ROBERT D. MULLANEY
   Trial Attorney, California State Bar # 116441
5  Environment and Natural Resources Division
   United States Department of Justice
6  301 Howard Street, Suite 1050
   San Francisco, California  94105
7  Telephone:  (415) 744-6491

8  McGREGOR W. SCOTT
   United States Attorney
9  E. ROBERT WRIGHT
   Assistant United States Attorney
10 Eastern District of California
   1130 "O" Street, Room 3654
11 Fresno, California  93721
   Telephone:  (559) 498-7272

12

   Attorneys for Plaintiff United States of America
13

14            IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
15                   FRESNO DIVISION

16
   UNITED STATES OF AMERICA,      )        No. 1:05-CV-00516-REC-SMS
17                                 )
              Plaintiff,           )
18                                 )
       v.                          )        CONSENT DECREE
19                                 )
   SAINT-GOBAIN CONTAINERS, INC.,  )
20                                 )
              Defendant.           )
21 _____ )

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3   I. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

4   II. APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

5   III. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

6   IV. CIVIL PENALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

7   V. COMPLIANCE REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

8   VI. SUPPLEMENTAL ENVIRONMENTAL PROJECT . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

9   VII. REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

10   VIII. STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

11   IX. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

12   X. DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

13   XI. INFORMATION COLLECTION AND RETENTION . . . . . . . . . . . . . . . . . . . . . . . . -32-

14   XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS . . . . . . . . . . . . . . . . . . . -34-

15   XIII. COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

16   XIV. NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

17   XV. EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

18   XVI. RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

19   XVII. MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

20   XVIII. TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

21   XIX. PUBLIC PARTICIPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

22   XX. SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

23   XXI. INTEGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

24   XXII. FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

25   XXIII. APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

26

27

28

1  Concurrently with the lodging of this Consent Decree, Plaintiff United States of

2  America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a

3  Complaint in this action pursuant to Section 113 of the Clean Air Act (the "Act"), 42 U.S.C.

4  § 7413, alleging that Defendant Saint-Gobain Containers, Inc. ("Defendant" or "SGCI") violated

5  the Act at its glass manufacturing facility in Madera, California (the "Facility").

6  The Complaint alleges that Defendant modified Furnace #2 at its Facility in

7  December 1998 without complying with the Prevention of Significant Deterioration of Air

8  Quality ("PSD") requirements of the Act.  Moreover, the Complaint alleges that Defendant failed

9  to install and operate a Continuous Emissions Monitoring System ("CEMS") on Furnace #1 at

10  the Facility, failed to conduct source tests at Furnaces #1 and #2, and submitted invalid

11  compliance certifications for Furnaces #1 and #2.

12  Defendant denies any liability to the United States arising out of the transactions

13  or occurrences alleged in the Complaint.

14  The Parties recognize, and the Court by entering this Consent Decree finds, that

15  this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation

16  between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

17  NOW, THEREFORE, before the taking of any testimony, without the

18  adjudication or admission of any issue of fact or law except as provided in Section I below, and

19  with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as

20  follows:

21  I. JURISDICTION AND VENUE

22  1.  This Court has jurisdiction over the subject matter of this action, pursuant

23  to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b), and

24  over the Parties.  Venue lies in this District pursuant to 42 U.S.C. § 7413(b), and 28 U.S.C.

25  §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint occurred in, and

26  Defendant conducts business in, this judicial District.  For purposes of this Decree, or any action

27  to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree or such

28  action and over Defendant, and consents to venue in this judicial District.

Consent Decree                         -1-

1         2.        For purposes of this Consent Decree, Defendant agrees that the Complaint

2 states claims upon which relief may be granted pursuant to Section 113(b) of the Act.

3         3.        Notice of the commencement of this action has been given to the State of

4 California, as required by Section 113(b) of the Act.

5                              II.  <u>APPLICABILITY</u>

6         4.        The obligations of this Consent Decree apply to and are binding upon the

7 United States, and upon Defendant and any successors, assigns, or other entities or persons

8 otherwise bound by law.

9         5.        Any transfer of ownership or operation of the Facility to any other person

10 must be conditioned upon the transferee's agreement:  (i) to subject itself to the jurisdiction of

11 this Court as the defendant in this Consent Decree, and (ii) to perform all remaining obligations

12 of SGCI required by this Decree, as provided in a written agreement between SGCI and the

13 proposed transferee, enforceable by the United States as a third-party beneficiary of such

14 agreement.  At least 30 days prior to such transfer, SGCI shall provide a copy of this Consent

15 Decree to the proposed transferee.  At least 15 days prior to such transfer, SGCI shall provide

16 written notice of the prospective transfer, together with a copy of the proposed written

17 agreement, to EPA and the United States, in accordance with Section XIV (Notices) of this

18 Decree.  If Defendant attempts to transfer ownership or operation of the Facility without

19 complying with this Paragraph, it shall constitute a violation of this Decree.  Defendant shall

20 remain obligated to ensure that the terms of the Decree are implemented until:  (1) Defendant has

21 paid the civil penalty as required by Section IV (Civil Penalty); (2) with respect to operations by

22 SGCI prior to transfer of ownership or operation of the Facility, Defendant has either paid any

23 accrued stipulated penalties owed to the United States pursuant to Section VIII (Stipulated

24 Penalties) or any disputes relating to stipulated penalties have been resolved pursuant to Section

25 X (Dispute Resolution); and (3) the transferee is substituted by the Court as a defendant under

26 this Decree.

27         6.        Defendant shall provide a copy of this Consent Decree to all officers,

28 employees, and agents whose duties include compliance with any provision of this Decree, as

Consent Decree                            -2-

1   well as to any contractor retained to perform on-site repair, installation, construction, rebuilding

2   or maintenance work required under this Consent Decree.  Defendant shall include the provisions

3   of Appendix B in any such contract.

4           7.      In any action to enforce this Consent Decree, Defendant shall not raise as a

5   defense the failure by any of its officers, directors, employees, agents, or contractors to take any

6   actions necessary to comply with the provisions of this Consent Decree.

7                                III.  DEFINITIONS

8           8.      Terms used in this Consent Decree that are defined in the Act or in

9   regulations promulgated pursuant to the Act shall have the meanings assigned to them in the Act

10  or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth

11  below are used in this Consent Decree, the following definitions shall apply:

12          a.      "Block 24-hour Average" shall mean the arithmetic average of the

13  hourly nitrogen oxides ("NOx") (measured as nitrogen dioxides ("$NO_2$")) emission rates divided

14  by the hourly pull rate of glass (in tons) of a furnace as measured over 24 one-hour periods, or a

15  fraction thereof when less than 24 one-hour periods are available, daily, from 12:00 a.m. to 11:59

16  p.m., excluding periods of CEMS and Continuous Emissions Rate Monitoring System

17  ("CERMS") calibration and emissions monitoring malfunction;

18          b.      "Block 24-hour Period" shall mean the sum of the hourly NOx

19  (measured as $NO_2$) emission rates of a furnace as measured over 24 one-hour periods, or a

20  fraction thereof when less than 24 one-hour periods are available, daily, from 12:00 a.m. to 11:59

21  p.m., excluding periods of CEMS and CERMS calibration and emissions monitoring

22  malfunction;

23          c.      "Cease Operations" shall mean that:  (i) on or before December 31,

24  2006, SGCI decides not to replace Furnace #2 and to produce no more glass from Furnace #2 or

25  any replacement for Furnace #2, or (ii) at any time after the permanent termination of operation

26  of Furnace #2 and its replacement with the Oxy-fuel Furnace, SGCI decides to produce no more

27  glass from the Oxy-fuel Furnace.

28          d.      "Commence Construction" shall mean that SGCI has all necessary

Consent Decree                          -3-

1  final preconstruction approvals or permits and either has:  (i) begun, or caused to begin, a

2  continuous program of actual on-site construction of the source, to be completed within a

3  reasonable time; or (ii) entered into binding agreements or contractual obligations, which cannot

4  be cancelled or modified without substantial loss to SGCI, for major pieces of equipment

5  required for the actual construction of the source to be completed within a reasonable time.

6          e.     "Complaint" shall mean the Complaint filed by the United States

7  in this action;

8          f.     "Consent Decree" or "Decree" shall mean this Decree and

9  Appendices A and B attached hereto;

10          g.     "Cullet" shall mean waste or broken glass, which is suitable for

11  remelting as an addition to a new batch.  Cullet includes post-consumer recycled glass and waste

12  glass produced by the Facility;

13          h.     "Daily Average Concentration" shall mean the arithmetic average

14  of the hourly sulfur dioxide ("$SO_2$") concentration (in parts per million on a dry volume basis

15  ("ppmdv")) measured over 24 one-hour periods, or a fraction thereof when less than 24 one-hour

16  periods are available, daily, from 12:00 a.m. to 11:59 p.m., excluding periods of CEMS

17  calibration and emissions monitoring malfunction;

18          i.     "Day" shall mean a calendar day unless expressly stated to be a

19  working day.  In computing any period of time under this Consent Decree, where the last day

20  would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of

21  business of the next working day;

22          j.     "Defendant" shall mean Saint-Gobain Containers, Inc.;

23          k.     "District" or "SJVUAPCD" shall mean the San Joaquin Valley

24  Unified Air Pollution Control District and any of its successor agencies;

25          l.     "EPA" shall mean the United States Environmental Protection

26  Agency and any of its successor departments or agencies;

27          m.     "Facility" shall mean Defendant's container glass manufacturing

28  facility located in Madera, California;

Consent Decree         -4-

1    n.    "Furnace #1" and "Furnace #2" shall mean the existing furnaces at

2    the Facility denoted by SJVUAPCD source numbers C-801-1 and C-801-2. Furnace #1 and

3    Furnace #2 are regenerative glass melting furnaces with a current melter area of 1,200 and 1,320

4    square feet, respectively;

5    o.    "Fused Cast Crown" shall mean either a fused cast alumina or

6    fused cast alumina-zirconia-silica refractory in the crown section of the Oxy-fuel Furnace;

7    p.    "Idling" shall mean a period when the glass pull rate is less than

8    110 tons of glass pulled per day for Furnace #2 or when the operation of the Oxy-fuel Furnace is

9    at less than 25 percent of the Permitted Production Capacity;

10    q.    "Malfunction" shall mean a sudden and unavoidable failure or

11    breakdown of air pollution control equipment that: (i) is caused by circumstances beyond the

12    control of the owner and/or operator; (ii) is not the result of intent, neglect, or disregard of air

13    pollution control laws, rules or regulations; (iii) is not the result of improper maintenance; and

14    (iv) is not an excessively recurrent breakdown of the same equipment.

15    r.    "NOx" shall mean the sum of oxides of nitrogen in the flue gas,

16    collectively expressed as $NO_2$;

17    s.    "Oxy-fuel Furnace" shall mean the oxygen-fuel furnace that SGCI

18    installs and operates pursuant to this Decree to replace Furnace #2. The Oxy-fuel Furnace will

19    be a glass melting furnace in which an enriched oxygen stream provides the oxidant for

20    combustion of the fuel. The Oxy-fuel Furnace may exceed the 1,320 square feet size of Furnace

21    #2 and may support additional glass container production through additional glass-forming

22    machines;

23    t.    "Paragraph" shall mean a portion of this Decree identified by an

24    Arabic numeral;

25    u.    "Parties" shall mean the United States and Defendant;

26    v.    "Permitted Production Capacity" shall mean the production

27    capacity in tons of glass pulled per day for the Oxy-fuel Furnace as stated in the Permit to

28    Operate for the Oxy-fuel Furnace.

Consent Decree                          -5-

1    w.    "Project Costs" shall mean all costs incurred pursuant to this

2    Consent Decree to purchase equipment, the costs of labor and materials for installing that

3    equipment, costs for site preparation and buildings, costs for land, working capital, and off-site

4    facilities.  Project Costs shall include costs for foundations and supports, erecting and handling

5    the equipment, electrical work, piping, insulation, painting, as well as engineering costs;

6    construction and field expenses (such as costs for construction supervisory personnel, office

7    personnel, rental of temporary offices, etc.); contractor and consulting fees (including, but not

8    limited to, construction and engineering firms involved in the project); and Start-up and

9    performance test costs (to get the system running and to verify that it meets performance

10    guarantees).

11    x.    "Section" shall mean a portion of this Decree identified by a

12    Roman numeral;

13    y.    "Shutdown" shall mean the period of time during which a glass

14    melting furnace is purposely allowed to cool from its operating temperature and molten glass is

15    removed from the tank for the purpose of a furnace rebuild or reconstruction, or during a natural

16    gas curtailment, or, subject to EPA's approval, when it is commercially necessary;

17    z.    "Start-up" shall mean the period of time, after initial construction,

18    a furnace rebuild, or a Shutdown, during which a glass melting furnace is heated to operating

19    temperature by the primary furnace combustion system, and systems and instrumentation are

20    calibrated; and

21    aa.    "Transition" shall mean a period of no more than 24 hours in

22    duration when the operations of the Oxy-fuel Furnace is at less than 50 percent but more than 25

23    percent of the Permitted Production Capacity.

24    bb.    "United States" shall mean the United States of America, acting on

25    behalf of EPA.

26    IV.  CIVIL PENALTY

27    9.    Within 5 business days after Defendant receives notice from the United

28    States that this Consent Decree has been lodged, Defendant shall deposit the sum of $929,000 as

Consent Decree    -6-

1   a civil penalty into an escrow account bearing interest on commercially reasonable terms, in a

2   federally-chartered bank (the "Escrow Account").  If the Consent Decree is not entered by the

3   Court, and the time for any appeal of that decision has run or if the Court's denial of entry is

4   upheld on appeal, the money placed in escrow, together with accrued interest thereon, shall be

5   returned to Defendant.  If the Consent Decree is entered by the Court, Defendant shall, within 10

6   days after Defendant receives notice from the United States thereof, cause the money placed in

7   the Escrow Account, together with accrued interest thereon, to be paid to the United States as a

8   civil penalty.  Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S.

9   Department of Justice in accordance with instructions to be provided to Defendant, following

10  lodging of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for

11  the Eastern District of California.  At the time of payment, Defendant shall simultaneously send

12  written notice of payment and a copy of any transmittal documentation (which should reference

13  DOJ case number 90-5-2-1-06982 and the civil action number of this case) to the United States

14  in accordance with Section XIV (Notices) of this Decree.

15          10.    Defendant shall not deduct the civil penalty of $929,000, together with

16  accrued interest thereon, paid under this Section in calculating its federal income tax.

17                          V.  <u>COMPLIANCE REQUIREMENTS</u>

18          11.    <u>Compliance Plan for Furnace #2</u>.  In order to control nitrogen oxides

19  ("NOx"), sulfur oxides ("SOx"), and particulate emissions at the Facility, SGCI shall comply

20  with the following compliance plan:

21                  a.    <u>Permanent termination of operation of Furnace #2</u>.  SGCI shall

22  permanently terminate the operation of, and produce no more glass from, Furnace #2 on or before

23  December 31, 2006.  Furnace #2 must be removed from the Facility before operation of the Oxy-

24  fuel Furnace.

25                  b.    <u>Installation of Oxy-fuel Furnace</u>.

26                          i.    Within 30 days after the Effective Date, SGCI shall submit

27  an application to the appropriate permitting authority for a preconstruction permit for an Oxy-

28  fuel Furnace to replace Furnace #2.  In the application, SGCI shall propose a Permitted

Consent Decree                     -7-

1  Production Capacity for the Oxy-fuel Furnace and shall propose the requirements specified in

2  Paragraphs 12, 13, and 14.

3              ii.      SGCI shall notify EPA pursuant to Section XIV (Notices)

4  of this Consent Decree not more than 10 calendar days after it submits a preconstruction permit

5  application and shall include a copy of the permit application submitted to the permitting

6  authority, if the permitting authority is not EPA.

7              iii.     SGCI shall notify EPA pursuant to Section XIV (Notices)

8  of this Consent Decree when SGCI receives a preconstruction permit for the replacement of

9  Furnace #2 with the Oxy-fuel Furnace and for the installation of the scrubber and ESP on

10  Furnace #1 and the Oxy-fuel Furnace.  The notification shall be postmarked not more than 10

11  calendar days after SGCI receives the preconstruction permit and shall include a copy of the

12  preconstruction permit issued by the permitting authority, if the permitting authority is not EPA.

13              iv.     Unless EPA agrees in writing to relieve SGCI of the

14  obligation, in whole or in part, of this Paragraph 11.b.iv., SGCI agrees that it will not accept, and

15  will appeal, a preconstruction permit issued by the permitting authority that does not include

16  permit conditions at least as stringent as those proposed in the preconstruction permit application

17  described in Paragraph 11.b.i.  Under these circumstances, all deadlines in this Consent Decree

18  related to construction and operation of the Oxy-fuel Furnace shall be stayed pending the final

19  outcome of any such appeal.

20              v.      Unless the preconstruction permit does not include permit

21  conditions at least as stringent as those proposed in the preconstruction permit application

22  described in Paragraph 11.b.i., SGCI shall Commence Construction on the Oxy-fuel Furnace

23  within 30 days after receiving a final preconstruction permit from the permitting authority.

24              vi.     SGCI shall complete construction of, and shall begin

25  operating, the Oxy-fuel Furnace by March 1, 2007.

26              vii.    Except as provided in Paragraph 11.b.viii., for purposes of

27  this Consent Decree and any other issue related to the emission reductions resulting from the

28  permanent termination of operation of Furnace #2, the parties stipulate that NOx emission

Consent Decree                    -8-

reductions from the permanent termination of operation of Furnace #2 that exceed 104 tons per year ("tpy") shall not be treated as actual emission reductions, but shall be treated as reductions that are not surplus emission reductions in excess of emission reductions required by law, and therefore are not eligible for conversion to Emission Reduction Credits ("ERCs").

                    viii.     Solely for the purposes of a netting calculation for the permitting of the Oxy-fuel Furnace, the NOx "baseline emissions," as defined in SJVUAPCD Rule 2201, Section 3.7 (approved by EPA on May 17, 2004, see 69 Fed. Reg. 27,837), shall not exceed 1.3 pounds of NOx per ton of glass pulled times the Permitted Production Capacity.

            c.     <u>Cease Operations</u>.

                    i.     SGCI reserves the right to Cease Operations at any time.  If SGCI decides to Cease Operations, SGCI shall, within 10 days after reaching its decision, notify EPA and the United States pursuant to Section XIV (Notices) of this Consent Decree.  The notification shall state the date that SGCI plans to Cease Operations.

                    ii.     If SGCI decides to Cease Operations and not to construct and operate the Oxy-fuel Furnace, SGCI:  (a) shall be subject to stipulated penalties pursuant to Paragraph 35 below, and (b) shall not use any emission reductions resulting from the permanent termination of operation of Furnace #2 to either apply for or obtain ERCs, or as reductions in any netting calculation.

            d.     SGCI shall notify EPA pursuant to Section XIV (Notices) of this Consent Decree of the date on which SGCI is in compliance with Paragraph 11.a., 11.b.v., and 11.b.vi.  The notification shall be postmarked not more than 10 calendar days after such dates.

         12.     <u>Requirements for Oxy-fuel Furnace, Scrubber, and ESP</u>.  Throughout the life of the Oxy-fuel Furnace, SGCI shall comply with the following requirements:

            a.     SGCI shall install, operate, and maintain an Oxy-fuel Furnace to control NOx in accordance with the following requirements:

                    i.     Emissions of NOx shall not exceed 1.3 pounds per ton of glass pulled, as calculated on a Block 24-Hour Average and determined by the NOx and flow monitoring described in Paragraph 13.

Consent Decree         -9-

1          ii.     The emission limit in Subparagraph 12.a.i. shall not apply

2  during periods of Idling, Transition, Start-up, or Shutdown.

3          iii.    SGCI shall install, maintain, and operate the Oxy-fuel

4  Furnace such that the combustion oxidant is at least 90 percent oxygen.

5          iv.    SGCI shall install, operate, and maintain staged combustion

6  low NOx oxy-fuel burners on the Oxy-fuel Furnace.

7          v.     SGCI shall install a Fused Cast Crown on the Oxy-fuel

8  Furnace.  SGCI shall maintain the Fused Cast Crown for the life of the Oxy-fuel Furnace unless

9  SGCI can show, at the time of any necessary repairs to the Fused Cast Crown, that the Fused

10  Cast Crown has proven technically or economically infeasible to maintain.  Within 10 days of its

11  decision to remove the Fused Cast Crown, SGCI shall notify EPA pursuant to Section XIV

12  (Notices) of this Consent Decree of its decision and shall provide the basis for its decision.

13          b.    SGCI shall install, operate, and maintain a scrubber system to

14  reduce SOx emissions by at least 85 percent ("Reduction Efficiency"), excluding days when the

15  scrubber inlet's Daily Average Concentration of $SO_2$ is 353 ppmdv or less, in which case the

16  scrubber outlet's Daily Average Concentration of $SO_2$ shall be reduced to at least 53 ppmdv

17  ("Daily Concentration Standard").  The averaging period for the Reduction Efficiency shall be

18  calculated on a rolling 30-day average basis, excluding days when the scrubber inlet's Daily

19  Average Concentration of $SO_2$ is 353 ppmdv or less.[1]/  Compliance with the SOx Reduction

20  Efficiency and Daily Concentration Standard shall be demonstrated by scrubber inlet and outlet

21  $SO_2$ continuous concentration monitoring as specified in Paragraph 13.

22          c.    SGCI shall install, operate, and maintain an electrostatic

23  precipitator ("ESP") to control particulate emissions in accordance with the following

24  requirements:

25  

26  [1]/The calculation of the rolling 30-day average may require more than 30 scrubber operating days.
For example, if the scrubber inlet's Daily Average Concentration of $SO_2$ is less than 353 ppmdv for

27  three days during a continuous 30-day period, then the calculation of the rolling 30-day average will
require an additional three days or a total of 33 operating days (i.e., 30 days that are subject to the

28  Reduction Efficiency standard and 3 days that are subject to the Daily Concentration Standard).

Consent Decree           -10-

i.      Particulate emissions shall be controlled to at least:  (1) 0.2 pounds of particulate per ton of glass pulled, using EPA Method 5 as set forth in 40 C.F.R. Part 60, Appendix A;  and (2) 0.45 pounds of particulate per ton of glass pulled, using the combined results of EPA Methods 5 and 202 as set forth in 40 C.F.R. Part 60, Appendix A.

d.      SGCI shall operate the Oxy-fuel Furnace for at least one year after SGCI has demonstrated compliance by initial compliance testing with the SOx Reduction Efficiency, particulate emission limits, and NOx emission limit established in this Consent Decree.

e.      <u>Start-Up Requirements for Oxy-fuel Furnace</u>.  SGCI shall submit a request for a Start-up exemption to the permitting authority in conjunction with the preconstruction permit application for the Oxy-fuel Furnace.

i.      The actual length of the Start-up exemption shall be determined by the permitting authority at the time of preconstruction permit issuance, but in any case it shall not exceed 70 days.  The Start-up exemption shall begin upon activation of the primary combustion system.

ii.      SGCI shall submit to the permitting authority any information deemed necessary by the permitting authority to determine the appropriate length of the Start-up exemption.  This information shall include, but may not be limited to, a detailed list of activities to be performed during Start-up, an explanation for the length of time needed to complete each activity, and a description of the material process flow rates and system operating parameters that SGCI plans to evaluate during the Start-up.

iii.      The length of the Start-up exemption, if any, will be determined at the discretion of the permitting authority.  The permitting authority will approve a Start-up exemption only to the extent that SGCI's submittal identifies the control technologies or strategies to be utilized, describes what physical conditions prevail during Start-up periods that prevent the controls from being effective, and provides a precise estimate as to when physical conditions will have reached a state that allows for the effective control of emissions.

iv.      During the Start-up period, the stoichiometric ratio of the

Consent Decree                                    -11-

primary furnace combustion system shall not exceed 5 percent excess oxygen, as calculated from the actual fuel and oxidant flow measurements for combustion in the glass melting furnace.

v.      During the Start-up period, the emission control systems shall be in operation as soon as technologically feasible to minimize emissions.

f.      Shutdown Requirements for Oxy-fuel Furnace.

i.      The duration of a Shutdown, as measured from the time the furnace production level drops below the Idling threshold to the time when all emissions from the furnace cease, shall not exceed 20 days.

ii.      The emission control systems shall be in operation whenever technologically feasible during Shutdown to minimize emissions.

g.      Idling and Transition Requirements for Oxy-fuel Furnace.

i.      During Idling and Transition, NOx emissions from the Oxy-fuel Furnace (calculated as a Block 24-hour Period) shall not exceed 1.3 pounds of NOx per ton of glass pulled times the Permitted Production Capacity.  (For example, if the Permitted Production Capacity is 540 tons of glass pulled per day, the daily NOx emissions shall not exceed 702 pounds per day.)  NOx emissions shall be determined by the NOx and flow monitoring described in Paragraph 13.

ii.      When Idling or a Transition occurs for less than 24 hours in a day, the NOx emissions limit in Paragraph 12.g.i shall apply and NOx emissions from 12:00 a.m. through 11:59 p.m. on that day shall be included in the calculation of the total daily NOx emissions.

iii.      The Oxy-fuel Furnace shall have no more than six Transitions during any calendar year.  Once a Transition begins, production must exceed 50 percent of the Permitted Production Capacity or be less than 25 percent of the Permitted Production Capacity for at least 24 hours before another Transition can be initiated.

iv.      The emission control systems shall be in operation whenever technologically feasible during Idling and Transition to minimize emissions.

v.      Scheduled or preventive maintenance of the emission

Consent Decree                          -12-

control systems shall occur only during Idling or after Shutdown.

h.  Malfunction Requirements.  When a Malfunction of the Oxy-fuel Furnace or any of the  air pollution equipment occurs, SGCI shall attempt to repair the Malfunction as soon as practicable, but in no event longer than 12 hours.  Off-shift labor and overtime must be utilized, to the extent practicable, to ensure that such repairs are made expeditiously.  If after 12 hours, the Malfunction is not corrected, the Oxy-fuel Furnace must be taken to Idling within 12 additional hours.

13.  Oxy-fuel Furnace Emissions Testing and Monitoring.

a.  The open hood stack exhaust system for Furnace #1 shall be eliminated by March 1, 2007.  The new exhaust system(s) for Furnace #1 and the Oxy-fuel Furnace shall be designed, installed, and maintained according to good engineering practices, including minimizing dilution air in the stack exhaust stream prior to measurement of opacity.

b.  Initial Compliance Testing.  Within 60 days after achieving 60 percent of the Permitted Production Capacity, but no later than 180 days after the commencement of the Start-up period of the Oxy-fuel Furnace, SGCI shall demonstrate compliance with:  (1) the SOx Reduction Efficiency; (2) the particulate emission limits; and (3) the NOx emission limit. The Continuous Opacity Monitoring System ("COMS") shall also be certified in the initial compliance testing period.

i.  The initial compliance testing for the SOx Reduction Efficiency shall be performed using an inlet and outlet $SO_2$ monitoring system that has met the requirements of Performance Specification 2 in 40 C.F.R. Part 60, Appendix B.  The $SO_2$ monitoring system shall meet the quality assurance requirements of 40 C.F.R. Part 60, Appendix F.

ii.  Compliance testing for particulate shall be conducted in accordance with EPA Reference Methods 1, 2, 5, and 202 as set forth in 40 C.F.R. Part 60, Appendix A.  Each test shall consist of three runs.  The sampling time and volume for each run shall be at least 60 minutes and 31.8 dry standard cubic feet.  Thereafter, compliance testing of particulate matter shall be conducted on an annual basis within 60 days of the anniversary date of

the latest compliance testing.

iii.    The initial compliance testing for NOx shall be demonstrated by a NOx CERMS that has met the requirements of Performance Specification 6 in 40 C.F.R. Part 60, Appendix B.  NOx monitoring systems shall meet the quality assurance requirements of 40 C.F.R. Part 60, Appendix F.

iv.    Certification of the COMS shall be demonstrated by meeting the requirements of 40 C.F.R. § 60.13 and 40 C.F.R. Part 60, Appendix B, Performance Specification 1.

c.    <u>Continuous Emission Monitoring</u>.  To show compliance with the NOx emission limit for the Oxy-fuel Furnace, SGCI shall measure the NOx emissions from the Oxy-fuel Furnace separately from emissions from Furnace #1.  After Start-up of the Oxy-fuel Furnace, SGCI shall maintain and operate:  (1) a CEMS for $O_2$, CO, and NOx in the Furnace #1 exhaust stream; (2) a CERMS in the Oxy-fuel Furnace exhaust stream; and (3) a COMS in the combined Oxy-fuel Furnace and Furnace #1 exhaust stream; and (4) a $SO_2$ CEMS at the inlet and outlet of the scrubber as follows:

i.    <u>CEMS to measure stack gas $O_2$, CO, and $SO_2$ concentrations</u>.  The CEMS shall meet the requirements of 40 C.F.R. § 60.13, 40 C.F.R. Part  60, Appendix B (Performance Specifications 2, 3, and 4), and 40 C.F.R. Part 60, Appendix F (Quality Assurance Procedures).

ii.    <u>CERMS to measure NOx emission rates</u>.  The CERMS shall meet the requirements of 40 C.F.R. Part 60, Appendix B, Performance Specification 6 and 40 C.F.R. Part 60, Appendix F (Quality Assurance Procedures).

iii.    The COMS shall meet the requirements of 40 C.F.R. § 60.13 and 40 C.F.R. Part 60, Appendix B, Performance Specification 1.

iv.    Monitoring of the ESP shall comply with the requirements of 40 C.F.R. Part 64.

d.    <u>Determination of NOx Emission Rate</u>.  The NOx emission rate measured by the CERMS in pounds per hour shall be converted to pounds of NOx per ton of

Consent Decree                                    -14-

glass pulled according to the following equation:

$$NO_x \text{ Emission Rate}\left(\frac{pounds\ NO_x}{ton\ glass\ pulled}\right) = \left(\frac{NO_x\ CERMS\left(\frac{pounds\ NO_x}{hour}\right)}{glass\ pull\ rate\left(\frac{ton\ glass\ pulled}{hour}\right)}\right)$$

14. <u>Recordkeeping and Reporting for the Oxy-fuel Furnace</u>. SGCI shall maintain the following information recorded in a permanent form, which may include electronic files, suitable for inspection:

a. A file of all continuous monitoring system, monitoring device, and performance testing measurements; all continuous monitoring system performance evaluations; all continuous monitoring system or monitoring device calibration checks; adjustments and maintenance performed on these systems or devices; and all other information required by 40 C.F.R. Part 60, Appendices A, B, and F;

b. Operating logs that contain the following data on a daily basis: hours of operation, glass pull rate (in tons of glass pulled), type and quantity of fuel used, NOx emissions (in pounds of NOx per ton of glass pulled, calculated on a Block 24-hour Average), percent Cullet used, electric boost used (in kilowatt-hours ("KWH")), oxygen quantity, and oxygen content of the combustion oxidant for the Oxy-fuel Furnace. The logs shall indicate periods of Idling, Transition, Start-up, and Shutdown, as well as any periods of maintenance, repair or Malfunction that affect the levels of emissions. This information, including all electronic files, shall be recorded and maintained until the Oxy-fuel Furnace is rebuilt, reconstructed, or Ceases Operation.

c. During Idling and Transition periods: A log that includes the following data on a daily basis: hours in Idling or Transition, glass pull rate (in tons of glass pulled), and pounds of NOx emitted (calculated as a Block 24-hour Period).

d. Within 30 days after the end of each calendar-year quarter (*i.e.*, by April 30, July 30, October 30, and January 30), Defendant shall submit to EPA and the District a "Quarterly Excess Emissions, CERMS, CEMS, and COMS Report" that conforms to the format

Consent Decree                    -15-

1   set forth in 40 C.F.R. § 60.7(c) and includes the following:

2                     i.     the magnitude of excess emissions, computed in

3   accordance with 40 C.F.R. § 60.13(h), any conversion factors(s) used, and the date and time of

4   commencement and completion of each time period of excess emissions;

5                    ii.    specific identification of each period of excess emissions

6   that occur during Idling, Start-ups, Shutdowns, and Malfunctions, together with the nature and

7   cause of any Malfunction (if known) and the corrective action taken or preventative measures

8   adopted;

9                   iii.   the date and time identifying each period during which the

10   continuous monitoring system was inoperative (except for zero and span checks) and the nature

11   of the system repairs or adjustments; and

12                   iv.   when no excess emissions have occurred or the continuous

13   monitoring system has not been inoperative, repaired, or adjusted, such information shall be

14   stated in the report.

15             e.    SGCI shall notify EPA pursuant to Section XIV (Notices) of this

16   Consent Decree of the date on which SGCI plans to conduct initial compliance testing required

17   by Paragraph 13.b. The notification shall be postmarked not less than 30 calendar days prior to

18   such date.

19             f.    SGCI shall notify EPA pursuant to Section XIV (Notices) of this

20   Consent Decree of the date on which SGCI has conducted the initial compliance testing required

21   by Paragraph 13.b. The notification shall be postmarked not more than 60 calendar days after

22   such date and shall include a copy of the compliance testing report. If the compliance testing

23   report is not available at the time of notification, SGCI shall provide a copy of the report to EPA

24   within 10 days after receiving it.

25         15.   <u>Interim Requirements for Furnace #2</u>. Beginning on the Effective Date

26   and continuing until the permanent termination of operation of Furnace #2, SGCI shall comply

27   with the following requirements for Furnace #2:

28             a.    From May 1 through October 31 of each year, emissions shall not

1  exceed 3.7 pounds of NOx per ton of glass pulled, as calculated on a Block 24-Hour Average and

2  determined by the NOx monitoring specified in subparagraph c; from November 1 through April

3  30 of each year, emissions shall not exceed 3.8 pounds of NOx per ton of glass pulled, as

4  calculated on a Block 24-Hour Average and determined by the NOx monitoring specified in

5  subparagraph c; provided, however, that these emission limits shall not apply during periods of

6  Idling, Start-up, or Shutdown.

7                      b.      During Idling, NOx emissions from Furnace #2 shall not exceed

8  1,650 pounds per day (calculated as a Block 24-hour Period) as determined by the NOx

9  monitoring specified in subparagraph c.  When Idling occurs for less than 24 hours in a day, the

10  NOx emissions limit in this subparagraph shall apply and NOx emissions from 12:00 a.m.

11  through 11:59 p.m. on that day shall be included in the calculation of the total daily NOx

12  emissions.

13                      c.      SGCI shall maintain and operate a CEMS in the Furnace #2

14  exhaust stack to measure $O_2$, NOx, and CO concentrations.  The system shall meet the

15  requirements of 40 C.F.R. § 60.13, 40 C.F.R. Part  60, Appendix B (Performance Specifications

16  2, 3, and 4), and 40 C.F.R. Part 60, Appendix F (Quality Assurance Procedures).

17                      d.      <u>Recordkeeping</u>.  Throughout the operating life of Furnace #2 and

18  for a five-year period thereafter, SGCI shall maintain the following information recorded in a

19  permanent form, which may include electronic files, suitable for inspection:

20                      i.      A file of all continuous monitoring system, monitoring

21  device, and performance testing measurements; all continuous monitoring system performance

22  evaluations; all continuous monitoring system or monitoring device calibration checks;

23  adjustments and maintenance performed on these systems or devices; and all other information

24  required by 40 C.F.R. Part 60, Appendices A, B, and F;

25                      ii.      Operating logs that include on a daily basis:  hours of

26  operation, glass pull rate (in tons of glass pulled), type and quantity of fuel used, NOx emissions

27  (in pounds of NOx per ton of glass pulled, calculated on a Block 24-hour Average), percent

28  Cullet used, and electric boost used  (in KWH).  The logs shall indicate periods of Idling and

Consent Decree                    -17-

1    Shutdown, as well as any periods of maintenance, repair or Malfunction that affect the levels of

2    emissions; and

3                        iii.    During Idling periods, SGCI shall maintain the following

4    information, recorded in a permanent form suitable for inspection, in an operating log that

5    includes on a daily basis:  hours in Idling, glass pull rate (in tons of glass pulled), and pounds of

6    NOx emitted (calculated as a Block 24-hour Period).

7                    e.    Reporting.  Within 30 days after the end of each calendar-year

8    quarter (*i.e.*, by April 30, July 30, October 30, and January 30), Defendant shall submit to EPA

9    and the District a "Quarterly Excess Emissions and CEMS Report" that conforms to the format

10   set forth in 40 C.F.R. § 60.7(c) and includes the following:

11                        i.    the magnitude of excess emissions, computed in

12   accordance with 40 C.F.R. § 60.13(h), any conversion factors(s) used, and the date and time of

13   commencement and completion of each time period of excess emissions;

14                        ii.    specific identification of each period of excess emissions

15   that occur during Idling, Shutdowns, and Malfunctions, together with the nature and cause of any

16   Malfunction (if known) and the corrective action taken or preventative measures adopted;

17                        iii.    the date and time identifying each period during which the

18   continuous monitoring system was inoperative (except for zero and span checks) and the nature

19   of the system repairs or adjustments; and

20                        iv.    when no excess emissions have occurred or the continuous

21   monitoring system has not been inoperative, repaired, or adjusted, such information shall be

22   stated in the report.

23                    16.    Permits.  When any compliance obligation under this Section requires

24   Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely

25   applications and timely provide additional information as requested by the permitting authority to

26   make its applications complete, and take all other actions necessary to obtain all such permits or

27   approvals.  Defendant may seek relief under the provisions of Section IX (Force Majeure) of this

28   Consent Decree for any delay in the performance of any such obligation resulting from a failure

Consent Decree                    -18-

to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI. SUPPLEMENTAL ENVIRONMENTAL PROJECT

17.    Defendant shall implement a Supplemental Environmental Project ("SEP") requiring installation of a scrubber and ESP to control SOx and particulate emissions from Furnace #1 at the Facility, in accordance with the following requirements:

a.    The scrubber system shall reduce SOx emissions from Furnace #1 as specified in Paragraph 12.b.  Initial compliance testing shall comply with Paragraph 13.b. if the Oxy-fuel Furnace is constructed.  If the Oxy-fuel Furnace is not constructed, the initial compliance testing shall take place by September 30, 2007.  Continuous emissions monitoring shall comply with Paragraph 13.c.

b.    The ESP shall control particulate emissions from Furnace #1 as specified in Paragraph 12.c.  Initial compliance testing shall comply with Paragraph 13.b. if the Oxy-fuel Furnace is constructed.  If the Oxy-fuel Furnace is not constructed, the initial compliance testing shall take place by September 30, 2007.  Monitoring of the ESP shall comply with the requirements of 40 C.F.R. Part 64.

c.    The scrubber and ESP shall be installed and operating to control SOx and particulate emissions from Furnace #1 by March 1, 2007.

d.    In implementing the SEP, Defendant shall spend not less than $1,080,000 in eligible SEP Project Costs for the scrubber and ESP for Furnace #1.  If SGCI has installed the scrubber and ESP on both Furnace #1 and the Oxy-fuel Furnace, SGCI shall multiply the total Project Costs for the scrubber and ESP for both furnaces by a factor of .24 in order to:  (1) allocate a portion of the total Project Costs to Furnace #1, and (2) determine the eligible SEP Project Costs.  Eligible SEP Project Costs do not include costs allocated to controlling SOx and particulate emissions from the Oxy-fuel Furnace.  If the Oxy-fuel Furnace is not constructed, SGCI shall use the total Project Costs for the scrubber and ESP for Furnace #1 to determine the eligible SEP Project Costs.

Consent Decree                                    -19-

1     e.     Emission Reduction Credits.

2          i.     No later than 180 days after installation of the scrubber and

3     ESP on Furnace #1, SGCI shall apply to SJVUAPCD for ERCs based on the reduction of

4     emissions resulting from installation and operation of the scrubber and ESP on Furnace #1.

5     SGCI shall take all actions necessary to convert such emission reductions to ERCs.

6          ii.     Within ten days after submitting the ERC application,

7     SGCI shall provide a copy of the application to EPA pursuant to Section XIV (Notices) of this

8     Consent Decree.  SGCI shall provide a copy to EPA pursuant to Section XIV (Notices) of this

9     Consent Decree of any other correspondence (sent or received by Defendant) with The

10    Environmental Resources Trust, Inc. ("ERT")  or any government agencies relating to ERCs

11    from this SEP within ten days after sending or receiving the correspondence.

12          iii.     If SGCI receives any ERCs from emission reductions

13    associated with the operation of the scrubber and ESP required by Paragraph 17 of this Consent

14    Decree, SGCI shall transfer ownership of those ERCs to ERT in Washington, D.C. by following

15    the procedures identified in Appendix A to this Consent Decree, which is hereby incorporated as

16    part of this Consent Decree.

17          iv.     If SGCI publicizes the transfer of ERCs to ERT, it shall

18    include the following language:  "This transfer of Emission Reduction Credits was undertaken in

19    connection with the settlement of an enforcement action, United States v. Saint-Gobain

20    Containers, Inc., taken on behalf of the U.S. Environmental Protection Agency under the Clean

21    Air Act."

22          f.     If Defendant decides to halt or abandon work on the SEP,

23    Defendant shall notify EPA and the United States of its decision pursuant to Section XIV

24    (Notices) of this Consent Decree.  The notification shall be postmarked no later than 10 days

25    after such decision and shall state the date that Defendant halted or abandoned work.

26    Defendant's failure to complete the SEP shall be subject to stipulated penalties as provided in

27    Paragraph 37.  Defendant is liable for stipulated penalties under Paragraph 37.d. only if it failed

28    to meet an applicable milestone under Paragraph 17 before it submitted notification to EPA and

1  the United States under this Paragraph 17.f.

2          18.    With regard to the SEP, Defendant certifies the truth and accuracy of each

3  of the following:

4                  a.    that all cost information provided to EPA in connection with

5  EPA's approval of the SEP is complete and accurate and represents a fair estimate of the costs

6  necessary to implement the SEP;

7                  b.    that, as of the date of executing this Decree, Defendant is not

8  required to perform or develop the SEP by any federal, state, or local law or regulation and is not

9  required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in

10  any other action in any forum;

11                  c.    that the SEP is not a project that Defendant was planning or

12  intending to construct, perform, or implement other than in settlement of the claims resolved in

13  this Decree;

14                  d.    that Defendant has not received, and is not negotiating to receive,

15  credit for the SEP in any other enforcement action; and

16                  e.    that Defendant will not receive any reimbursement for any portion

17  of the SEP from any other person.

18          19.    SEP Completion Report.  No later than June 30, 2007, Defendant shall

19  submit a SEP Completion Report to the United States, in accordance with Section XIV (Notices)

20  of this Consent Decree.  The SEP Completion Report shall contain the following information:

21                  (1)    a detailed description of the SEP as implemented;

22                  (2)    a description of any problems encountered in completing the SEP

23  and the solutions thereto;

24                  (3)    an itemized list of all eligible SEP Project Costs;

25                  (4)    certification that the SEP has been fully implemented pursuant to

26  the provisions of this Decree; and

27                  (5)    a description of the environmental and public health benefits

28  resulting from implementation of the SEP (with a quantification of the benefits and pollutant

Consent Decree                              -21-

reductions, if feasible).

20. EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to determine the adequacy of SEP completion or eligibility of SEP Project Costs, and Defendant shall use its best efforts to provide such information.

21. After receiving the SEP Completion Report, the United States shall notify Defendant whether or not Defendant has satisfactorily completed the SEP. If the SEP has not been satisfactorily completed in accordance with the requirements of this Consent Decree, or if the amount expended on performance of the SEP is less than the amount set forth in Paragraph 17, above, Stipulated Penalties may be assessed under Section VIII of this Consent Decree.

22. Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP Project Costs may be resolved under Section X (Dispute Resolution) of this Decree. No other disputes arising under this Section shall be subject to Dispute Resolution.

23. Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 27, below.

24. Any public statement, oral or written, in print, film, or other media, made by Defendant making reference to the SEP under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States v. Saint-Gobain Containers, Inc., taken on behalf of the U.S. Environmental Protection Agency under the Clean Air Act."

## VII. REPORTING REQUIREMENTS

25. Defendant shall submit the following reports:

a. Within 30 days after the end of each calendar-year quarter (*i.e.*, by April 30, July 30, October 30, and January 30) after the Effective Date until termination of this Decree pursuant to Section XVIII, Defendant shall submit to EPA a quarterly report for the preceding quarter that shall include the status of any construction or compliance measures (e.g., permitting process, anticipated start-up of operation, testing, etc.); completion of milestones;

Consent Decree                                    -22-

1   problems encountered or anticipated, together with implemented or proposed solutions; status of

2   permit applications; reports to the District; and a discussion of Defendant's progress in satisfying

3   its obligations in connection with the SEP under Section VI of this Decree including, at a

4   minimum, a narrative description of activities undertaken and compliance with the schedules or

5   milestones set forth in the Decree.

6                           b.       Report of Operating Logs.  Until termination of this Consent

7   Decree, a copy of the operating logs, including all electronic files, for the Oxy-fuel Furnace

8   maintained pursuant to Paragraph 14 shall be submitted to the District and EPA on an annual

9   basis on March 1 each year pursuant to Section XIV (Notices) of this Consent Decree.

10                          c.       Report of Costs.  Within 120 days of completing construction of

11  the Oxy-fuel Furnace, SGCI shall report to EPA the Project Costs separately for the (1) Fused

12  Cast Crown; and (2) scrubber and ESP.  This report shall include detailed supporting

13  documentation of those costs such as invoices from vendors and other internal accounting

14  records relevant to the costs incurred.

15                          d.       Defendant shall notify the United States in writing, within ten

16  working days of the day Defendant first becomes aware of a violation or a potential violation of

17  any requirement of this Consent Decree, and shall identify its likely duration, with an explanation

18  of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or

19  minimize such violation.  If the cause of a violation cannot be fully explained at the time the

20  report is due, Defendant shall so state in the report.  Defendant shall investigate the cause of the

21  violation and shall then submit an amendment to the report, including a full explanation of the

22  cause of the violation, within 30 days of the day Defendant becomes aware of the cause of the

23  violation.  Nothing in this Paragraph or the following Paragraph relieves Defendant of its

24  obligation to provide the notice required by Section IX (Force Majeure) of this Consent Decree.

25                  26.       All reports shall be submitted to the persons designated in Section XIV

26  (Notices) of this Consent Decree.

27                  27.       Each report submitted by Defendant under this Section shall be signed by

28  an official of the submitting party and include the following certification:

Consent Decree                                    -23-

1
2
3
4
5
6
7

I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather and present the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowingly and willfully submitting a materially false statement.

8   This certification requirement does not apply to emergency or similar notifications where

9   compliance would be impractical.

10          28.     The reporting requirements of this Consent Decree do not relieve

11   Defendant of any reporting obligations required by the Act or implementing regulations, or by

12   any other federal, state, or local law, regulation, permit, or other requirement.

13          29.     Any information provided pursuant to this Consent Decree may be used by

14   the United States in any proceeding to enforce the provisions of this Consent Decree and as

15   otherwise permitted by law.

16                      VIII.  STIPULATED PENALTIES

17          30.     If Defendant fails to pay the civil penalty required to be paid under Section

18   IV (Civil Penalty) of this Decree when due, Defendant shall pay a Stipulated Penalty of $5,000

19   per day for each day that the payment is late. Late payment of the civil penalty shall be made in

20   accordance with Section IV, Paragraph 9, above. Stipulated Penalties shall be paid in accordance

21   with Section VIII, Paragraph 41, below. All transmittal correspondence shall state that any such

22   payment is for late payment of the civil penalty due under this Decree, or for Stipulated Penalties

23   for late payment, as applicable, and shall include the identifying information set forth in

24   Paragraph 9, above.

25          31.     Defendant shall be liable for Stipulated Penalties to the United States for

26   violations of this Consent Decree as specified below, unless excused under Section IX (Force

27   Majeure). A violation includes failing to perform any obligation required by the terms of this

28   Decree, including any work plan or schedule approved under this Decree, according to all

Consent Decree                          -24-

applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

32.    Emissions Limits.  The following Stipulated Penalties shall accrue per violation per day for each violation of a requirement of Paragraph 12.a.i., 12.b., 12.c.i., and 12.g.i., and Paragraph 15.a. and 15.b., above:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $1,000 | 1st through 14th day |
| $3,500 | 15th through 30th day |
| $10,000 | 31st day and beyond |

For the purpose of determining Stipulated Penalties for the emissions limits only, days of noncompliance are cumulative from the Effective Date and need not be continuous.

33.    Compliance Milestones.

a.    The following Stipulated Penalties shall accrue per violation per day for each violation of the requirements identified in Subparagraph b:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $1,000 | 1st through 14th day |
| $3,500 | 15th through 30th day |
| $10,000 | 31st day and beyond |

b.    The applicable compliance milestones are as follows:

| Requirement | Paragraph |
| --- | --- |
| Termination of operation of Furnace #2 | 11.a |
| Submittal of permit application | 11.b.i |
| Appeal of deficient permit | 11.b.iv |
| Commence construction | 11.b.v |
| Begin operation of Oxy-fuel Furnace | 11.b.vi |

34.    Reporting and Recordkeeping Requirements.  The following Stipulated Penalties shall accrue per violation per day for each violation of the reporting and recordkeeping requirements of Sections V and VII of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 | 1st through 30th day |
| $750 | 31st day and beyond |

No Stipulated Penalties shall accrue under Paragraph 34 for the first 90 days after the Effective Date of this Consent Decree.

35.   Oxy-fuel Furnace; Installation of Fused Cast Crown.

a.   If Defendant decides to Cease Operations and not to construct and operate the Oxy-fuel Furnace pursuant to Paragraph 11.c., Defendant shall pay stipulated penalties as follows:

i.   If Defendant provides notice that it will Cease Operations in calendar year 2005, Defendant shall pay a base stipulated penalty of $1,381,000 for past operations.  In addition, Defendant shall pay:

$$\frac{\$1,400,000 \times Number\ of\ Months\ of\ Operation\ in\ 2005}{12}$$

ii.   If Defendant provides notice that it will Cease Operations in calendar year 2006, Defendant shall pay a base stipulated penalty of $2,781,000 for past operations.  In addition, Defendant shall pay:

$$\frac{\$1,424,000 \times Number\ of\ Months\ of\ Operation\ in\ 2006}{12}$$

b.   If Defendant does not install the Fused Cast Crown on the Oxy-fuel Furnace, Defendant shall pay a Stipulated Penalty of $535,000.

36.   For Defendant's failure to comply with any other requirement of Section V of this Consent Decree not specifically referenced in Paragraphs 32 - 35 above:

| Penalty per Violation per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th day |
| $1,500 | 15th through 30th day |
| $2,000 | 31st day and beyond |

Consent Decree                                        -26-

37.    SEP Compliance.

a.    If Defendant has spent less than the amount set forth in Paragraph 17.d, above, in implementation of the SEP, Defendant shall pay a Stipulated Penalty equal to the difference between the amount of total eligible SEP Project Costs incurred by Defendant and the amount set forth in Paragraph 17.d.

b.    If Defendant has completed the SEP, but the SEP is not satisfactory, Defendant shall pay a Stipulated Penalty of $133,000 in addition to any penalty required under Subparagraph a, above.

c.    If Defendant halts or abandons work on the SEP, the Defendant shall pay a Stipulated Penalty of $200,000 in addition to any penalty required under Subparagraph a, above, and any penalties owing under Subparagraph d, below, for milestones missed up to the time that the penalty under this Subparagraph accrues.  The penalty under this Subparagraph shall accrue as of the date specified for completing the SEP or the date performance ceases, whichever is earlier.

d.    If Defendant fails to comply with the schedule in Section VI or Appendix A of this Consent Decree for implementing the SEP, Defendant shall pay Stipulated Penalties for each failure to meet an applicable milestone, as follows:

| Penalty Per Violation Per Day | Period of Noncompliance |
| --- | --- |
| $250 | 1st through 14th day |
| $500 | 15th through 30th day |
| $1,000 | 31st day and beyond |

Subject to Paragraph 37.a - c, above, such penalties shall accrue from the date Defendant was required to meet each such milestone, until compliance with the milestone is achieved.

38.    Subject to the provisions of Paragraph 37.a - c, above, Stipulated Penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated Penalties shall accrue simulta-neously for separate violations of this Consent Decree.  Defendant shall pay any Stipulated

Consent Decree                    -27-

1  Penalty within 30 days of receiving the United States' written demand.

2          39.    The United States may, in the unreviewable exercise of its discretion,

3  reduce or waive Stipulated Penalties otherwise due it under this Consent Decree.

4          40.    Stipulated Penalties shall continue to accrue as provided in Paragraph 38,

5  above, during any Dispute Resolution, with interest on accrued penalties payable and calculated

6  at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need

7  not be paid until the following:

8          a.    If the dispute is resolved by agreement or by a decision of EPA

9  that is not appealed to the Court, Defendant shall pay accrued penalties agreed upon or

10  determined to be owing, together with interest, to the United States within 30 days of the

11  effective date of the agreement or the receipt of EPA's decision or order.

12          b.    If the dispute is appealed to the Court and the United States

13  prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to

14  be owing, together with interest, within 60 days of receiving the Court's decision or order, except

15  as provided in Subparagraph c, below.

16          c.    If any Party appeals the District Court's decision, Defendant shall

17  pay all accrued penalties determined to be owing by the appellate court, together with interest,

18  within 15 days of receiving the final appellate court decision.

19          41.    Defendant shall, as directed by the United States in its demand, pay

20  Stipulated Penalties owing to the United States by EFT in accordance with Section IV, Paragraph

21  9, above or by certified or cashier's check in the amount due, payable to the "U.S. Department of

22  Justice," referencing DOJ No. 90-5-2-1-06982, and delivered to:

23                      United States Attorney's Office
                       Eastern District of California

24                      Attn:  Tina Baca, Financial Litigation Unit
                       501 "I" Street, Suite 10-100

25                      Sacramento, CA  95814

26          42.    Defendant shall not deduct Stipulated Penalties paid under this Section in

27  calculating its federal income tax.

28          43.    If Defendant fails to pay Stipulated Penalties according to the terms of this

Consent Decree                    -28-

1 Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in

2 28 U.S.C. § 1961, accruing as of the date payment became due.

3          44.     Subject to the provisions of Section XII (Effect of Settlement/Reservation

4 of Rights) of this Consent Decree, the Stipulated Penalties provided for in this Consent Decree

5 shall be in addition to any other rights, remedies, or sanctions available to the United States for

6 Defendant's violation of this Consent Decree or applicable law.  Where a violation of this

7 Consent Decree is also a violation of the Act, Defendant shall be allowed a credit, for any

8 Stipulated Penalties paid, against any statutory penalties imposed for such violation.

9                          IX.  <u>FORCE MAJEURE</u>

10          45.     For purposes of this Consent Decree, a "Force Majeure Event" is any

11 event arising from causes beyond the control of Defendant, its contractors, or any entity

12 controlled by Defendant that delays the performance of any obligation under this Consent Decree

13 and that cannot be overcome by Defendant's diligent and timely efforts.  "Diligent and timely

14 efforts" include anticipating any potential Force Majeure Event and addressing the effects of any

15 such event (a) as it is occurring and (b) after it has occurred, such that delay is minimized to the

16 extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any

17 obligation under this Consent Decree.

18          46.     Defendant shall provide notice orally or by electronic or facsimile

19 transmission to the United States as soon as possible, but not later than 72 hours after the time

20 Defendant first knew of, or by the exercise of due diligence, should have known of, a claimed

21 Force Majeure Event.  Defendant shall also provide written notice to the United States, as

22 provided in Section XIV (Notices) of this Consent Decree, within seven days of the time

23 Defendant first knew of, or by the exercise of due diligence, should have known of, the event.

24 The notice shall state the anticipated duration of any delay; its cause(s); Defendant's past and

25 proposed actions to prevent or minimize any delay; a schedule for carrying out those actions; and

26 Defendant's rationale for attributing any delay to a Force Majeure Event.  Failure to provide oral

27 and written notice as required by this Paragraph shall preclude Defendant from asserting any

28 claim of force majeure, unless such failure was due to a Force Majeure Event.

Consent Decree                    -29-

47.     If the United States agrees that a Force Majeure Event has occurred, the time for Defendant to perform the activity delayed by the Force Majeure Event shall be extended for the time period of the delay attributable to the Force Majeure Event.  An extension of time to perform the obligations affected by a Force Majeure Event shall not, by itself, extend the time to perform any other obligation.  Where the United States agrees to an extension of time, the appropriate modification shall be made pursuant to Section XVIII (Modification) of this Consent Decree.

48.     If the United States does not agree that a Force Majeure Event has occurred, or does not agree to the extension of time sought by Defendant, the United States' position shall be binding, unless Defendant invokes Dispute Resolution under Section X of this Consent Decree.  In any such dispute, Defendant bears the burden of proving, by a preponderance of the evidence, that each claimed Force Majeure Event is a Force Majeure Event, that Defendant gave the notice required by Paragraph 46, that the Force Majeure Event caused any delay Defendant claims was attributable to that event, and that Defendant exercised diligent and timely efforts to prevent or minimize any delay caused by the event.

## X.  DISPUTE RESOLUTION

49.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  However, such procedures shall not apply to actions by the United States to enforce obligations of the Defendant that Defendant has not disputed in accordance with this Section.

50.     Informal Dispute Resolution.  Any dispute subject to dispute resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when the United States receives a written Notice of Dispute from Defendant.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 20 days from the date the United States receives the Notice of Dispute, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall

1   be considered binding unless, within 20 days after receiving written notice from the United States

2   terminating informal negotiations, Defendant invokes formal dispute resolution procedures as set

3   forth below.

4          51.   <u>Formal Dispute Resolution</u>.  Defendant shall invoke formal dispute resolu-

5   tion procedures, within the time period provided in the preceding Paragraph, by serving on the

6   United States a written Statement of Position regarding the matter in dispute.  The Statement of

7   Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion

8   supporting Defendant's position and any supporting documentation relied upon by Defendant.

9          52.   The United States shall serve its Statement of Position within 30 days of

10   receipt of Defendant's Statement of Position.  The United States' Statement of Position shall

11   include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting

12   that position and any supporting documentation relied upon by the United States.  The United

13   States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for

14   judicial review of the dispute in accordance with the following Paragraph.

15          53.   Defendant may seek judicial review of the dispute by filing with the Court

16   and serving on the United States, in accordance with Section XIV (Notices) of this Consent

17   Decree, a motion requesting judicial resolution of the dispute.  The motion must be filed within

18   10 days of receipt of the United States' Statement of Position pursuant to the preceding

19   Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in

20   dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set

21   forth the relief requested and any schedule within which the dispute must be resolved for orderly

22   implementation of the Consent Decree.

23          54.   The United States shall respond to Defendant's motion within the time

24   period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the

25   extent permitted by the Local Rules.

26          55.   In any dispute brought under Paragraph 53, Defendant shall bear the

27   burden of demonstrating that its position clearly complies with this Consent Decree and the Act

28   and that Defendant is entitled to relief under applicable law.  The United States reserves the right

Consent Decree                        -31-

1  to argue that its position is reviewable only on the administrative record and must be upheld

2  unless arbitrary and capricious or otherwise not in accordance with law.

3         56.    The invocation of dispute resolution procedures under this Section shall

4  not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this

5  Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated Penalties

6  with respect to the disputed matter shall continue to accrue from the first day of noncompliance,

7  but payment shall be stayed pending resolution of the dispute as provided in Paragraph 40,

8  above.  If Defendant does not prevail on the disputed issue, Stipulated Penalties shall be assessed

9  and paid as provided in Section VIII (Stipulated Penalties).

10              XI.  INFORMATION COLLECTION AND RETENTION

11        57.    The United States and its representatives, including attorneys, contractors,

12  and consultants, shall have the right of entry into the Facility, at all reasonable times, upon

13  presentation of credentials, to:

14              (1)    monitor the progress of activities required under this Consent

15  Decree;

16              (2)    verify any data or information submitted to the United States in

17  accordance with the terms of this Consent Decree;

18              (3)    obtain samples and, upon request, splits of any samples taken by

19  Defendant or its representatives, contractors, or consultants;

20              (4)    obtain documentary evidence, including photographs and similar

21  data; and

22              (5)    assess Defendant's compliance with this Consent Decree.

23        58.    Upon request, Defendant shall provide EPA or its authorized

24  representatives splits of any samples taken by Defendant.  Upon request, EPA shall provide

25  Defendant splits of any samples taken by EPA.

26        59.    Until the termination of this Consent Decree as specified in Paragraph 75,

27  Defendant shall retain, and shall instruct its contractors and agents to preserve, copies of all

28  documents, records, or other information (including documents, records, or other information in

Consent Decree                    -32-

electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession, and that relate to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, the United States may request copies of any documents, records, or other information required to be maintained under this Paragraph.

60.    At the conclusion of the information-retention period provided in the preceding Paragraph (i.e., upon the termination of this Consent Decree), Defendant shall notify the United States at least 90 days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph, and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

61.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

62.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or

1    state laws, regulations, or permits.

2    XII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

3         63.    This Consent Decree resolves the civil claims of the United States for the

4    violations alleged in the Complaint filed in this action through the date of lodging or alleged in

5    the following Notices of Violation:  Docket Nos. R9-99-13, R9-99-14, R9-02-07, R9-02-18, and

6    R9-03-08.

7         64.    The United States reserves all legal and equitable remedies available to

8    enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 63.  This

9    Consent Decree shall not be construed to limit the rights of the United States to obtain penalties

10   or injunctive relief under the Act or implementing regulations, or under other federal laws,

11   regulations, or permit conditions, except as expressly specified in Paragraph 63.  The United

12   States further reserves all legal and equitable remedies to address any imminent and substantial

13   endangerment to the public health or welfare or the environment arising at, or posed by,

14   Defendant's Facility, whether related to the violations addressed in this Consent Decree or

15   otherwise.

16        65.    This Consent Decree is not a permit, or a modification of any permit,

17   under any federal, State, or local laws or regulations.  Defendant is responsible for achieving and

18   maintaining compliance with all applicable federal, State, and local laws, regulations, and

19   permits; and Defendant's compliance with this Consent Decree shall be no defense to any action

20   commenced pursuant to any such laws, regulations, or permits.  The United States does not, by

21   its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's

22   compliance with any aspect of this Consent Decree will result in compliance with provisions of

23   the Act, 42 U.S.C. §§ 7401 - 7671q, or with any other provisions of federal, State, or local laws,

24   regulations, or permits.

25        66.    This Consent Decree does not limit or affect the rights of Defendant or of

26   the United States against any third party, not a party to this Consent Decree, nor does it limit the

27   rights of any third party, not a party to this Consent Decree, against Defendant, except as

28   otherwise provided by law.

Consent Decree                          -34-

67. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not a party to this Consent Decree.

## XIII.  COSTS

68. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any Stipulated Penalties due but not paid by Defendant.

## XIV.  NOTICES

69. Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and shall be sent by certified mail, express mail, or similar overnight mail delivery with return receipt requested and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Re:  DOJ No. 90-5-2-1-06982

and

Chief, Environmental Enforcement Section
Attn:  DOJ # 90-5-2-1-06982 (Mullaney)
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California  94105

and

Kara Christenson, ORC-2
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, California  94105

To EPA:

Director, Air Division (AIR-1)
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, California  94105
Attention:  Cyntia Steiner

Consent Decree                        -35-

To Defendant:

Saint-Gobain Containers, Inc.
1509 South Macedonia Avenue
Muncie, IN  47307
ATTN:  President and CEO

and

Saint-Gobain Containers, Inc.
1509 South Macedonia Avenue
Muncie, IN  47307
ATTN:  Sr. VP and General Counsel

and

Saint-Gobain Containers, Inc.
1509 South Macedonia Avenue
Muncie, IN  47307
ATTN:  VP - Environmental, Health and Safety

70.     Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

71.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

XV.  <u>EFFECTIVE DATE</u>

72.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

XVI.  <u>RETENTION OF JURISDICTION</u>

73.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

XVII.  <u>MODIFICATION</u>

74.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

Consent Decree                    -36-

1

XVIII.  TERMINATION

2    75.    After Defendant has complied with all requirements relating to Paragraphs

3  5 (if applicable), 11, 12, 13.a., 13.b., and 15, and Section VI of this Consent Decree, and has paid

4  the civil penalty and any accrued Stipulated Penalties as required by this Consent Decree,

5  Defendant may serve upon the United States a Request for Termination, stating that Defendant

6  has satisfied those requirements, together with all necessary supporting documentation.

7    76.    Following receipt by the United States of Defendant's Request for

8  Termination, the Parties shall confer informally concerning the Request and any disagreement

9  that the Parties may have as to whether Defendant has satisfactorily complied with the require-

10  ments for termination of this Consent Decree.  If the United States agrees that the Decree may be

11  terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the

12  Decree.

13    77.    If the United States does not agree that the Decree may be terminated,

14  Defendant may invoke Dispute Resolution under Section X of this Decree.  However, Defendant

15  shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 51 of

16  Section X, until 60 days after service of its Request for Termination.

17

XIX.  PUBLIC PARTICIPATION

18    78.    This Consent Decree shall be lodged with the Court for a period of not less

19  than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United

20  States reserves the right to withdraw or withhold its consent if the comments regarding the

21  Consent Decree disclose facts or considerations indicating that the Consent Decree is inappro-

22  priate, improper, or inadequate.  Defendant consents to entry of this Consent Decree without

23  further notice.

24

XX.  SIGNATORIES/SERVICE

25    79.    Each undersigned representative of Defendant and the Assistant Attorney

26  General for the Environment and Natural Resources Division of the Department of Justice or her

27  delegate certifies that he or she is fully authorized to enter into the terms and conditions of this

28  Consent Decree and to execute and legally bind the Party he or she represents to this document.

Consent Decree                              -37-

1      80.     This Consent Decree may be signed in counterparts, and its validity shall

2  not be challenged on that basis.

3      81.     Defendant agrees not to oppose entry of this Consent Decree by the Court

4  or to challenge any provision of the Decree, unless the United States has notified Defendant in

5  writing that it no longer supports entry of the Decree.

6      82.     Defendant agrees to accept service of process by mail with respect to all

7  matters arising under or relating to this Consent Decree and to waive the formal service

8  requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

9  applicable Local Rules of this Court including, but not limited to, service of a summons.

10                          XXI.  INTEGRATION

11      83.     This Consent Decree constitutes the final, complete, and exclusive

12  agreement and understanding between the Parties with respect to the settlement embodied in the

13  Decree and supersedes all prior agreements and understandings, whether oral or written,

14  concerning the settlement embodied herein.  No other document, nor any representation,

15  inducement, agreement, understanding, or promise, constitutes any part of this Decree or the

16  settlement it represents, nor shall it be used in construing the terms of this Decree.

17                          XXII.  FINAL JUDGMENT

18      84.     Upon approval and entry of this Consent Decree by the Court, this Consent

19  Decree shall constitute a final judgment of the Court as to the United States and Defendant.  The

20  Court finds that there is no just reason for delay and therefore enters this judgment as a final

21  judgment under Fed. R. Civ. P. 54 and 58.

22                          XXIII.  APPENDICES

23      85.     The following appendices are attached to and incorporated into this

24  Consent Decree:

25

26

27

28

1       Appendix A, which is entitled "Instructions for Transferring Emission Reduction Credits

2       to The Environmental Resources Trust, Inc;" and

3       Appendix B, regarding contracts between SGCI and a third party contractor.

4

5                              **ORDER**

6                IT IS SO ORDERED:

7

8                _____ROBERT E. COYLE_____

9                United States District Judge

10

11               DATED:___June 20, 2005_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                  -39-

1   FOR PLAINTIFF UNITED STATES OF AMERICA:

2

3   Dated:_____            _____
                                       KELLY A. JOHNSON
4                                      Acting Assistant Attorney General
                                       Environment & Natural Resources Division
5                                      U.S. Department of Justice

6

7   Dated:_____            _____
                                       ROBERT D. MULLANEY
8                                      Trial Attorney
                                       Environmental Enforcement Section
9                                      U.S. Department of Justice
                                       301 Howard Street, Suite 1050
10                                     San Francisco, California  94105
                                       Telephone:  (415) 744-6491

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                        -40-

1

2    Dated:_____          _____
                                      THOMAS V. SKINNER
3                                     Acting Assistant Administrator
                                      Office of Enforcement and Compliance Assurance
4                                     U.S. Environmental Protection Agency
                                      1200 Pennsylvania Avenue
5                                     Mail Code 2201A
                                      Washington, D.C.  20460
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                    -41-

1

2   Dated:_____                    _____
                                              WAYNE NASTRI
3                                             Regional Administrator
                                              U.S. Environmental Protection
4                                               Agency, Region 9
                                              San Francisco, CA
5

6   OF COUNSEL:

7   KARA CHRISTENSON
    Senior Counsel
8   U.S. Environmental Protection Agency, Region 9
    75 Hawthorne Street
9   San Francisco, CA  94105

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                          -42-

1   FOR DEFENDANT SAINT-GOBAIN CONTAINERS, INC.:

2

3   Dated:_____          _____

4                                  JEFF FORGANG
                                     Vice President - Environmental, Health & Safety
                                   Saint-Gobain Containers, Inc.

5                                     1509 South Macedonia Avenue
                                   Muncie, IN  47307

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                          -43-

**APPENDIX A**

**INSTRUCTIONS FOR TRANSFERRING EMISSION REDUCTION CREDITS
TO THE ENVIRONMENTAL RESOURCES TRUST, INC.**

1.     Within 30 days after receiving any Emission Reduction Credits ("ERCs") that are required to be transferred to The Environmental Resources Trust, Inc. ("ERT") by Paragraph 17.e. of this Consent Decree, Defendant shall request that the San Joaquin Valley Unified Air Pollution Control District ("SJVUAPCD") transfer ownership of the ERCs to ERT.

2.     Title to the ERCs shall be transferred to the following entity:

> The Environmental Resources Trust, Inc.
> 1612 K Street, N.W., Suite 1400
> Washington, D.C.  20006
> Phone:  (202) 785-8577
> EIN:  31-1475919

3.     For all ERCs required to be transferred to ERT, Defendant shall request SJVUAPCD to issue original ERC certificates in ERT's name and after receipt shall physically transfer those certificates to ERT accompanied by a letter that assigns all rights and title to the ERCs to ERT.  If after good faith efforts, Defendant is unable to obtain original ERC certificates in ERT's name, Defendant shall:  (1) endorse the ERC certificates to ERT; (2) transfer possession of the endorsed ERC certificates to ERT; (3) assign all rights and title to the ERCs to ERT; and (4) request that SJVUAPCD register the ERCs in ERT's name.  Defendant shall pay all costs and fees, if any, associated with such assignment, transfer, and registration.

4.     When Defendant physically transfers ERC certificates to ERT or otherwise notifies ERT of the transfer of ERCs, Defendant shall provide the following notification:

> "These Emission Reduction Credits ("ERCs") are being transferred to The Environmental Resources Trust, Inc. ("ERT") subject to the following restrictions:  ERT shall retire or hold these ERCs in order to achieve a permanent improvement in air quality in the San Joaquin Valley Air Basin.  These restrictions shall apply in perpetuity to all ERCs acquired from Defendant and held by ERT."

5.     Any correspondence between Defendant and ERT shall refer to this Consent Decree, its date of entry, the case name of United States v. Saint-Gobain Containers, Inc., the Case Number and judicial District (E.D. Cal.), and DOJ# 90-5-2-1-06982.

6.     Defendant shall provide the United States and EPA, in accordance with Section

1   XIV (Notices) of this Consent Decree, with copies of all correspondence sent or received by

2   Defendant related to the transfer of ERCs to ERT within 10 days after sending or receiving the

3   correspondence.  This notice requirement applies to all correspondence with any government

4   entity or with ERT.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Decree                                    -45-

**APPENDIX B**

The following provision shall be included in any contract between SGCI and any third party contractor covering any on-site repair, installation, construction, rebuilding or maintenance work required under this Consent Decree:

Contractor acknowledges that it has received a copy of the Consent Decree in <u>United States of America v. Saint-Gobain Containers, Inc.</u>, Civil No. _____, and understands that its work under this contract is undertaken pursuant to the provisions of that Consent Decree.